IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ADAM DAVID SEYMOUR,<br><br>Defendant. | Case No. 3:23-mj-00217-KFR |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Katie Yarborough, having been first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a criminal complaint and arrest warrant pursuant to Federal Rules of Criminal Procedure 3 and 4. As explained more fully below, I have probable cause to believe that ADAM DAVID SEYMOUR has committed the following federal criminal offenses:

> **Count 1 – Assault with Intent to Commit a Felony**: On or about April 5, 2023, within the special aircraft jurisdiction of the United States, ADAM DAVID SEYMOUR did assault D.S. with intent to commit a felony, to wit: abusive sexual contact in violation of 18 U.S.C. § 2244, all of which is in violation of 18 U.S.C. § 113(a)(2) and 49 U.S.C. §46506(1).

> **Count 2 – Assault**: On or about April 5, 2023, within the special aircraft jurisdiction of the United States, ADAM DAVID SEYMOUR did assault R.N., all of which is in violation of 18 U.S.C. § 113(a)(2) and 49 U.S.C. §46506(1).

2.     The statements in this affidavit are based in part on information provided to me by other law enforcement officers, police reports, my own investigation of this matter, and my

training and experience. Since this affidavit is being submitted for the limited purpose of establishing probable cause to support a complaint and securing an arrest warrant, I have not included each and every fact known to me concerning this investigation.

3.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI). I have been a SA with the FBI for approximately four years. I am currently assigned to the Violent Crime squad in the FBI Anchorage Field Office. During my time with the FBI, I have led and participated in investigations involving violent crimes, threats, robbery, fraud, and drugs. I also investigate violations of federal law occurring in the Special Aircraft Jurisdiction of the United States.

**FACTS ESTABLISHING PROBABLE CAUSE**

4.      On April 5, 2023, at approximately 11:45 a.m., FBI Operations Center in the Anchorage Field Office received a phone call from Anchorage Airport Police Dispatch, who reported that a passenger, Adam David SEYMOUR, aboard Alaska Airlines flight 49, had been physically restrained. A male adult passenger, SEYMOUR, had made sexual advances to a female adult passenger, D.S., sitting directly beside him. The incident had escalated to the point SEYMOUR had to be physically restrained to a seat.

5.      Alaska Airlines flight 49 departed from Seattle, Washington and was scheduled to arrive at 12:35 p.m. in Anchorage, Alaska at gate C3. After the flight landed at the Ted Stevens Anchorage International Airport (TSAIA), an FBI agent and Airport Police Officers conducted interviews of the flight crew, victims, witnesses, and SEYMOUR.

6.      The victim, D.S., was sitting in a middle seat, and SEYMOUR was seated in the adjacent aisle seat. D.S. reported that SEYMOUR seemed to be friendly at first when she

*U.S. v. Seymour*
3:23-mj-00217-KFR                          Page 2 of 7
Case 3:23-mj-00217-KFR   Document 1-1   Filed 04/07/23   Page 2 of 7

sat down next to him. D.S. noticed there were three colored bottles inside the pocket attached to the back of the seat located in front of SEYMOUR. D.S. described the bottles as being toiletry-type bottles approximately three ounces in size. Each bottle was a different color: pink, green, and blue. D.S. stated immediately after boarding the plane and sitting down, SEYMOUR opened the green bottle and proceeded to drink the contents. D.S. could not see what was inside the bottle because they were colored.

7.      During the first beverage service, D.S. observed SEYMOUR order two bottles of Jack Daniels with coke. D.S. reported that after SEYMOUR consumed these drinks, his behavior changed. SEYMOUR started slurring his words, began moving physically closer to D.S. rubbed her lower thigh and knee on the inner and outer areas without her consent and tried to rest his head on her shoulder.

8.      SEYMOUR made multiple comments to D.S. about her sexuality, including that he thought she "looked like a lesbian." SEYMOUR asked D.S. other intrusive personal questions. At first, D.S. did not answer SEYMOUR. Based on his demeanor and behavior, D.S. was worried what SEYMOUR would do to her if she said something that triggered him. D.S. reported that she was trying to be as calm as possible and trying not to trigger him in any way. SEYMOUR kept asking D.S. if she was a lesbian and started making sexual comments to D.S., talking about licking D.S. "down there." D.S. tried leaning away from SEYMOUR every time he touched her.

9.      After making the sexual comments to D.S., SEYMOUR told her that "we're all going to die", gesturing with his hands in a fashion that D.S. interpreted as showing the aircraft crashing. D.S. was frightened by SEYMOUR's actions and comments and tried to

*U.S. v. Seymour*
3:23-mj-00217-KFR                              Page 3 of 7
Case 3:23-mj-00217-KFR   Document 1-1   Filed 04/07/23   Page 3 of 7

get the attention of the flight crew, without success. SEYMOUR continued asking D.S. if she was a lesbian and making sexual comments saying to D.S. that, he "could pussy real good." D.S. had a blanket resting on her lap in between her legs. After SEYMOUR made that comment, he moved his hand in between D.S.'s legs and tapped her multiple times over the blanket, directly over her genitals. D.S. immediately closed her legs, leaned forward, and turned her back to him.

10.    A few moments later she heard a sparking sound and turned to see SEYMOUR holding an ignited lighter and a lit cigarette, which he was starting to smoke. D.S. yelled at SEYMOUR, that he was not allowed to smoke. SEYMOUR then started shaking the lit cigarette to put it out, and told D.S., "I'm a bad person." D.S. kept trying to get the attention of a flight crew member but was unsuccessful. She then wrote a message on her phone asking for help and slid her phone between the seats in front of her through the seats to show the message to C.A., who was seated directly in front of her. C.A. and the person sitting next to her, K.B., were both off-duty police officers. K.B. went and got a flight attendant after reading the message, and D.S. was moved to another seat. C.A. stated that after D.S. was moved to another seat, SEYMOUR became upset with R.N., the passenger sitting in the window seat, and stated he wanted to fight him. C.A. heard SEYMOUR tell R.N. that he was going to "kill" him. C.A. and K.B. then got up and helped get SEYMOUR into restraints and moved him to sit at the jump seat located at the front of the plane. While SEYMOUR was sitting in the jump seat, he forced his hands out of the restraints and had to be placed in them again. C.A. and K.B. stayed with SEYMOUR until the plane landed and Airport Police arrived.

*U.S. v. Seymour*
3:23-mj-00217-KFR                        Page 4 of 7

Apr 06, 2023

11.	During the interview of R.N., he stated he witnessed SEYMOUR boarding the plane "clearly unstable and wobbly." R.N. stated that shortly after takeoff he saw SEYMOUR start touching D.S. According to R.N., SEYMOUR started "touching her arm, trying to fist bump her, touched her back, inside of her leg, put his hand on her…." Then SEYMOUR closed his eyes and passed out with his head bobbing. SEYMOUR kept waking back up, leaning on D.S. and start touching her again. R.N. states D.S. was "clearly uncomfortable."

12.	After D.S. was moved to another passenger's seat, that passenger was then moved to D.S.'s seat for the duration of the flight. R.N. stated SEYMOUR then started to fall asleep but woke up and physically pushed the male passenger who was now sitting in the middle seat. R.N. decided to say something, so he leaned forward and told SEYMOUR he needed to, "stay in his lane. Sit down and shut up. Leave people alone." SEYMOUR then threatened R.N., saying he would "smoke" him. R.N. then stood up to go get a flight attendant, at which point SEYMOUR told R.N., "I'm going to kill you." R.N. felt "very threatened and feared for [his] safety." R.N. stated SEYMOUR "groped me, assaulted a woman, threatened my life, and was clearly so wasted it was impossible to tell if he would explode." R.N. noticed SEYMOUR's plastic bottles and believed they were filled with alcohol.

13.	During the interview of the male passenger, M.R., who exchanged seats with D.S. and sat in the middle seat next to SEYMOUR, M.R. stated SEYMOUR offered him whiskey that he brought on board the plane. After a short time, SEYMOUR then elbowed M.R. in his side, pushed M.R.'s shoulders, and passed out on M.R.'s shoulder.

*U.S. v. Seymour*
3:23-mj-00217-KFR	Page 5 of 7

14. During the interview of D.R. who sat in the aisle seat directly across from SEYMOUR, D.R. stated that SEYMOUR appeared to be extremely intoxicated and witnessed SEYMOUR pulling the plastic bottles out of his bag that he brought on the plane.

15. During the interview of one of the flight attendants, C.L., she stated she was notified during the beverage service about D.S.'s message for help. C.L. and another flight attendant immediately stopped working the beverage service to help D.S. After moving D.S. to a new seat, SEYMOUR continued to threaten other passengers next to him. C.L. stated, "he was obviously inebriated and snuck his own alcohol on the plane." C.L. stated even after the lead flight attendant and C.A. and K.B. put flex cuffs on SEYMOUR, SEYMOUR continued to not comply with the police officers or the flight attendants.

16. During the interview of another flight attendant, B.H., she stated that SEYMOUR was visibly intoxicated and had asked her for more beer, which she denied due to his apparent impairment. B.H. witnessed SEYMOUR drinking something and asked him what it was, to which SEYMOUR replied, "hand sanitizer." B.H. stated the other passengers told her SEYMOUR was threatening to kill people and saying that they were all going to die, and the plane was going to crash.

17. During the interview of the third flight attendant, C.J., C.J stated when SEYMOUR got out of his restraints while sitting in the jump seat, the flight crew had to immediately stop what they were doing and apply a third restraint around him.

18. SEYMOUR was detained by Airport Police after the flight landed. I arrested him pursuant to my authority under 18 U.S.C. § 3052. Before being transported to Anchorage Correctional Complex (ACC), SEYMOUR refused to be administered a Breath Alcohol

U.S. v. Seymour
3:23-mj-00217-KFR          Page 6 of 7
Case 3:23-mj-00217-KFR   Document 1-1   Filed 04/07/23   Page 6 of 7

Content test (BrAC) by Airport Police Officers. A Task Force Officer with the

Airport Police Department subsequently swabbed SEYMOUR's hands utilizing the

Ion Scan 600, an electronic device which detects trace amounts of controlled

substances. SEYMOUR's hands alarmed for the presence of cocaine. SEYMOUR

was then transported to ACC, where SEYMOUR also refused to be administered a

BrAC by the ACC medical nurse during the intake medical exam.

**CONCLUSION**

19.     I have probable cause to believe that SEYMOUR has committed the

offenses described in the complaint. Accordingly, I ask the court to issue a warrant

for SEYMOUR's arrest in accordance with Federal Rule of Criminal Procedure

4(a).


RESPECTFULLY SUBMITTED

Katie Yarborough
Special Agent, FBI

Affidavit subscribed and sworn pursuant to  Fed. R.
Crim. P. 4.1 and 41(d)(3) on this _____ day of March, 2023.

April 06, 2023

HON. KYLE F. REARDON
United States Magistrate Judge
District of Alaska
Anchorage, Alaska


U.S. v. Seymour
3:23-mj-00217-KFR